UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES LEE | Case No. 24-cr-10035-JEK |

### SENTENCING MEMORANDUM OF THE UNITED STATES

The United States of America submits this Sentencing Memorandum in advance of the sentencing for James Lee ("James" or the "defendant").[1] The defendant played an integral role in a sprawling criminal organization that operated a multi-state prostitution network and money laundering operation. On at least sixty-three occasions since 2021, the defendant accepted payment from his co-conspirator Han Lee ("Han") in exchange for renting in his name or fraudulent identities at least six apartments used for commercial sex. He protected the prostitution and money laundering organization in multiple ways, and it would not have been successful without his active participation.

While engaged in prostitution and money laundering conspiracies, the defendant was also defrauding the government of funds designed to assist small businesses suffering from the economic effects of the COVID-19 pandemic. He used his name, his fraudulent identities, his shell companies and his bank accounts to fraudulently obtain COVID-19 relief funds exceeding a half million dollars.

For his involvement in this prostitution and money laundering conspiracies and the wire fraud, on February 26, 2025, the defendant pleaded guilty to a three-count Superseding

---

[1] The government refers to the defendant by his first name here for clarity sake, given that other co-defendants share the same last name. The government refers to his co-defendants by their first names as well for the same reason.

Information charging him with conspiracy to persuade, induce, entice, and coerce others to travel interstate to engage in prostitution, in violation of 18 U.S.C. § 371, money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and wire fraud, in violation of 18 U.S.C. § 1343 There is a plea agreement ("Plea Agreement") pursuant to Rule 11(c)(1)(B) in this case. D.E. 152.

Given the nature and circumstances of James's offenses, his history and characteristics, and the factors set forth in 18 U.S.C. § 3553(a), the government recommends that this Court impose a sentence of 33 months and three years of supervised release. Such a sentence is sufficient, but not greater than necessary to achieve the goals of sentencing pursuant to 18 U.S.C. § 3553(a).

I. **Application of the Sentencing Guidelines**

James's conduct is not in dispute and is summarized in the Presentence Report ("PSR") prepared by United States Probation ("Probation") at paragraphs 9-101.[2] For purposes of calculating the advisory Guidelines Sentencing Range ("GSR"), the government notes that there are three groups, two of which are closely related and group together. For counts one and two, the "prostitution and money laundering" group, the United States agrees that the defendant's base offense level is 14 pursuant to USSG § 2X1.1 and § 2G1.1(a). The United States also agrees that the offense level is increased by two levels because James was convicted under 18 U.S.C. § 1956 pursuant to USSG §2S1.1(b)(2)(B). As for this group, the parties agreed in the Plea Agreement that five levels are added because there are more than five victims for which the offense level

---

[2] The only exception is that in paragraph 101, the gross amount of EIDL and PPP advances and loans is $585,**5**33 and not $585,**7**33 and that amount is reduced by the known partial repayments totaling $16,410. Therefore, the net loss is $569,**1**23 not $569,**3**23 as stated in the PSR. The correct amount is reflected in the Superseding Information, the Plea Agreement and the Motion for forfeiture and money judgment (and corresponding proposed orders for the latter); therefore, the government requests this Court make the minor clerical change to the PSR so that the loss amount aligns with those Court documents.

would have been equally serious, pursuant to USSG § 2G1.1(d)(1) and § 3D1.4.[3]

The government understands that Probation applied a two-level enhancement under USSG § 2S1.1(b)(2)(B) for engaging in sophisticated money laundering. As noted in the PSR, the government stands by its calculation of the GSR in the Plea Agreement, in which the parties did not apply the sophisticated money laundering enhancement. Based on the above, the parties agree that the offense level for the prostitution and money laundering group is 21.

As to count three, the government agrees with Probation that the base offense level is 7 because the offense of wire fraud carries a statutory term of imprisonment of 20 years. USSG § 2B1.1(a)(1). Probation correctly determined that the offense level is increased by 14 because the loss amount is more than $550,000 but less than $1,500,000. USSG § 2B1.1(b)(H). The government also agrees that the wire fraud offense level is further increased by 2 because it involved unauthorized use of a means of identification unlawfully to produce or obtain any other means of identification. USSG § 2B1.1(b)(11)(C). As such, the offense level for the wire fraud group is 23.

The prostitution and money laundering group (Counts One and Two) does not group with the wire fraud group (Count Three). The wire fraud group is the higher of the two offense levels with an offense level of 23. Because there are two groups, under the grouping rules, the offense level increases to 25. James is entitled to a three-level downward adjustment for acceptance of responsibility pursuant to USSG § 3E1.1. This brings the offense level to 22.

---

[3] The government notes that Probation did not apply an increase in five levels given that at least six victims were identified. USSG § 2G1.1(d)(1) and believes this was incorrect per Application Note 5 of § 2G1.1(d)(1) and per § 2D1.2(d). Consistent with the USSG and recognizing that the wire fraud group will control the guideline calculation, the government requests the Court apply an additional five levels to the prostitution and money laundering group in order to properly account for each of the separate and distinct victims of the defendant's criminal activity.

While the defendant has no prior scoreable criminal history, as described in the final PSR, Probation noted that the defendant did not meet the criteria set forth in USSG §§ 4C1.1(a)(1)-(11) because one of the offenses of conviction – conspiracy to commit § 2422 – is a sex offense and precludes the defendant from benefitting from the zero-point adjustment. Based on the plain reading of the language in § 4C1.1(a)(5) and (b)(2), the government sees the merits of Probation's analysis and reasoning and agrees with it. That is to say, the offense of conspiracy to entice others to travel interstate to engage in prostitution is a sex offense and therefore precludes defendants from a two-level downward adjustment under § 4C1.1(a) and (b). The government notes, however, that the defendant's co-conspirator, Junmyung, was convicted of the same offense and did not have any prior convictions, but that Probation, and in turn this Court, applied the two-point downward adjustment pursuant to § 4C1.1(a) and (b) to him when calculating the GSR. The government does not believe that this Court needs to make a finding as to whether the prostitution conspiracy offense precludes this defendant from benefiting from the zero-point adjustment. In order to avoid any unwarranted sentencing disparity with his co-conspirator Junmyung, the government's sentencing recommendation is 33 months, which reflects two level downward departure to maintain consistency among the co-defendants.[4]

## II.   The Factors Set Forth in 18 U.S.C. § 3553(a)

The sentencing factors outlined in 18 U.S.C. § 3553(a) support the government's recommended sentence. As this Court is aware, the guidelines are a "starting point and initial

---

[4] If the Court applied the two-level downward adjustment, it should solely be to avoid unwarranted sentencing disparities among James and Junmyung. Upon doing so, the total offense level is 20 with a corresponding GSR, at Criminal History Category I, of 33-41 months. If the Court does not apply the zero-point adjustment, the total offense level is 22 with a corresponding GSR, at Criminal History Category I, of 41-51 months. Regardless, the government asks this Court to depart by two levels to maintain the consistency among the similarly situated defendants to achieve this similar result, the government does not believe the Court needs to decide if the offense of conviction precludes the defendant from benefiting from the Chapter Four Adjustment.

benchmark" in sentencing proceedings. *Gall v. United States,* 552 U.S. 38, 49 (2007). After that calculation, the Court must consider the seven factors outlined in §3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to protect the public from future crimes of the defendant. *Id.* at 50, n.6.

### A. The Nature and Circumstances of the Crime

#### 1. James's Critical Role in the Profitability of the Criminal Enterprise

As detailed in the PSR, James' was known throughout the Korean brothel owner community as someone who would rent apartments in his name or his fraudulent identifies to use those rentals in furtherance of prostitution. Brothel networks across the country trusted James with this responsibility because he would provide protection to the women engaged in commercial sex and the prostitution managers by communicating with the apartment management companies, including for maintenance to indicate that he is "out of town" and that his niece" is presently located at the apartment. In fact, in August 2023, James fielded a call related to an active water leak from the property managers for one of the Virginia brothel units and told them that his "daughter" was staying in the apartment while he was away. The defendant also protected Han's organization, and the women tied to it, by placing the apartment leases in his name or fraudulent identities so that there would be a layer separating the brothel owners from the intended purpose of the rental units.

Han was one of many brothel owners across the country who relied upon James for this purpose. As evident when law enforcement conducted a controlled recorded call to James using a confidential source who posed as a brothel owner looking to open their own "shop," James did not hesitate to support brothel owners as they expanded their organizations. He explained on the recorded call that his job was to procure leases for the brothel owners, place the leases in his name

or fake identities and field phone calls from the property managers to protect the owners so that their businesses could continue to thrive in the shadows. James told the cooperating source that the brothel owners only had to pay his travel costs, specifically plane tickets and hotel costs for one night in the city where the brothel was located so that James could travel to "start" the apartment leases. Likewise, at a fee of only $1,000 per month per brothel location, brothel owners were incentivized to utilize James' services.

To put it simply, James was a savvy but greedy businessman. He knew the value of his services to brothel owners like Han and priced his product – apartment rentals and a layer of protection for the brothel owners from the property managers – accordingly. Brothel owners like Han willingly flew James around the country to open brothel leases and paid the $1,000 per month fee because such a fee was worth it considering the amount of profit each brothel unit rented by James brought in for their prostitution organization.

Because of James' dependability and his willingness to place up to at least four brothel apartment leases at once in his own name and his aliases, Han was able to expand her business and bring in more profits. For Han, he rented at least six apartments in his name or his fraudulent identities. Financial records reflect payments of $1,000 by Han to James or his wife at least sixty-three times totaling at least $63,000. At the time of his arrest and the execution of search warrants in November 2023, four units rented by James were active and from each law enforcement recovered women engaged in commercial sex for the Boston Top Ten and Brown Eyes Girls businesses. During the entirety of the conspiracy period, the illicit prostitution business made at least $5.6 million off of approximately 9,450 commercial sex dates. James's reliability made him a good employee for Han and allowed him to personally profit royally off of women selling their bodies for sex to complete strangers thousands of times in multiple different apartments.

## 2. The Harm to the Women

Dozens and dozens of women engaged in commercial sex work for this prostitution organization over many years. The co-conspirators set up the infrastructure to entice the women to travel from other states to Massachusetts and Virginia to sell their bodies for sex. While the government believes that the women engaged in sex acts under the legal standard of "voluntarily," they were vulnerable women who were exploited by the organization.[5] The Government also asserts that while the women were not "forced" to engage in commercial sex, as defined by federal law, of course this was not their *choice*. To have a price set for one's body and to engage in repetitive sex acts with strangers is a choice for those with limited or no other choices.

The crime of prostitution often is viewed as a simple and victimless crime. Such a perception ignores the long-term impact on the women and society. At the most basic level, profiting off the sale of other women's bodies involves the degradation of women because their bodies are bought and sold as commodities. In examining the seriousness of the offense, the Court must review the harm to these women, as subtle as those harms may appear on their face. *United States v. Cunningham*, 680 F.Supp. 2d 844, 855 (N.D. Ohio 2010). Fifty-five percent of women and children who have been sold in the commercial sex trade report suffering from post-traumatic stress disorder ("PTSD") and 42% report attempting suicide at least once.[6] The women engaged in prostitution share common risk factors which make them vulnerable to this crime. It is not unusual for women to have been abused when they were young, been victims of rape, suffer from addictions, experience poverty or experience abusive relationships. While not all women engaged

---

[5] The government notes that the evidence gathered during the investigation did not support charges of sex trafficking by force, fraud or coercion, in violation of 18 U.S.C. § 1591 which would have subjected the co-conspirators to a fifteen-year mandatory minimum period of incarceration.

[6] "The Health Consequences of Sex Trafficking and Their Implications for Identifying Victims in Healthcare Facilities." Annals of Health Law 23, 61-91.

in commercial sex have difficult backgrounds or upbringings, it is not uncommon for these factors to be present. In this case, most of the women interviewed were undocumented immigrants with no or expired legal status in the United States. Some of the women were recruited while in their home countries to come to the United States and engage in commercial sex work upon arrival. Others began commercial sex work shortly after entering the United States. And yet one indicated that it was not until she arrived in Boston in November 2023 that she realized what type of work she was expected to engage in to make money on behalf of Han's business.

### 3. The Scope of the Prostitution and Money Laundering Conspiracies

The prostitution business spanned multiple states, existed for years before law enforcement interdiction, and resulted in its co-conspirators making millions of dollars off commercial sex of other women. The multiyear investigation led by Homeland Security Investigations and the Cambridge Police Department showed that the prostitution organization operated two websites, www.bostontopten10.com and www.browneyesgirlsva.blog that operated as fronts for commercial sex services in the greater Boston and eastern Virginia areas. Women were advertised as "nude models" on more than one website as they traveled a circuit and engaged in commercial sex for the organization. The women in the advertisements were updated frequently, with postings that included "open" or "coming soon," showing a frequent rotation of women that kept the demand, and therefore profits, high.

Commercial sex operated out of brothels, specifically, high-end apartments in Massachusetts and Virginia. Co-conspirators, including James, placed apartment leases in their names, or fraudulent identities, and paid for rent and utilities using structured money orders of prostitution proceeds. The co-conspirators, including James, hid the true purpose of the rental units from the property management companies by placing the apartments in various names and fraudulent identities and protected the organization by fielding calls from the property managers

related to maintenance issues. Men who solicited the brothels were extensively verified by the co-conspirators. In all instances, the men provided personal information and selfies which allowed the network to screen the sex buyers and ensure that none worked for law enforcement and could shut down her business. The customer lists were maintained in phones associated with each brothel website. The network used these phones to communicate with sex buyers and book and negotiate prices for their appointments. Once appointments were set, the women were notified by the holder of the phones about their schedule for the day. After a day's work, the women stayed at the apartments overnight, so they did not have to find lodging elsewhere.

Members of the organization picked up the prostitution proceeds from the brothels and concealed the funds in various ways, including by purchasing structured money orders which were used to pay business expenses, by making structured cash deposits, and by moving the funds throughout accounts managed by the co-conspirators or various third parties. The records maintained by the business were in the forms of appointment books and ledgers documenting volume of commercial sex dates and total earnings. By the time search warrants were executed in November 2023, this multiyear, multistate business was a thriving criminal enterprise that brought in millions of dollars and enticed dozens upon dozens of women to travel to other states to engage in prostitution.

4. **The Wire Fraud**

The defendant's greed led him not only to the prostitution and money laundering conspiracies, but to wire fraud too. Fraud during the COVID-19 pandemic was unfortunately widespread, resulting in a loss of confidence in such government programs. *See, e.g.,* U.S. Government Accountability Office, *How Prevalent is Fraud in Federal Programs? We Take a Look—Focusing on Unemployment Insurance Oversight* (January 23, 2023). The pandemic assistance fraud also resulted in a massive loss to taxpayers and individuals who genuinely needed

relief during the pandemic. Every dollar that James obtained fraudulently in his name, his aliases and his fraudulent businesses was a dollar that a business that legitimately needed the relief was unable to secure.

The defendant sought at least six different CARES Act loans, including both the SBA's Economic Injury Disaster Loan ("EIDL") and Paycheck Protection Program ("PPP") loans. These loans were designed to keep small businesses afloat during the pandemic. For each of these loans, James used the name, date of birth, and social security number of himself or his fraudulent identity ("Imposter Identity") to submit loan applications. He opened bank accounts using his name and social security number or the Imposter Identity to receive the loan disbursements, possessed a driver's license bearing his photograph but in the name of his Imposter Identity to support his loan applications, and submitted fraudulent business documents that the Small Business Administration ("SBA") relied upon when granting the loan applications. He created shell companies with no legitimate business operations to fraudulently obtain EIDL funds. He transferred the funds in these shell company bank accounts in a manner that reflected no legitimate economic purpose and concealed the funds in various manners including through a check kiting scheme and transfers among his shell companies and the shell companies of others. By utilizing aliases, James was able to obtain a larger volume of fraudulent loan funds than would otherwise be possible if using only his true identity. The aliases also aided in avoiding detection by the SBA and law enforcement.

As such, James caused to be submitted at least four EIDL applications and one PPP loan application and obtained fraudulently at least $580,000. The defendant argues that he did not profit completely off the fraudulently obtained funds and that the loss amount "barely falls into the loss range of $550,000-$1,500,000." D.E. 180 at 2. The government disagrees with this characterization. The loss amount is a conservative one and based off the amount of loans from which the defendant personally acknowledged responsibility, specifically, loans tied to his name

or his fraudulent identities and the corresponding sham businesses. Given the defendant's quick movement of funds in the bank accounts of the defendant's shell businesses, the government admittedly cannot fully quantify exactly how much the defendant profited off of the fraudulently obtained pandemic relief funds he obtained. But make no mistake, the defendant certainly used the money for his – and his family's – personal use. For example, the defendant used his fraudulently obtained pandemic relief funds to assist his son with a down payment on a home in February 2022. As reflected in the financial records and closing documents, part of the purchase price of the son's home included a $147,099 gift from the defendant's wife. A review of the wife's bank records showed that the gift funds were derived from her own $26,500 in cash, approximately $110,000 from eight different shell business accounts in James' business network[7] and transfers from personal accounts held by the defendant and his wife, which had also received deposits of cash and checks from various business network accounts. For the defendant to argue that he did not personally benefit much from the government funds he intentionally and fraudulently obtained – and deliberately concealed – is disingenuous at best given the means by which the defendant – and others – quickly moved different types of funds around and within various accounts.[8]

---

[7] Throughout the investigation, investigators identified numerous bank accounts held in the name of more than fifty different business entities that were controlled by James (in his own name or one of his assumed identities with initials of L.K. and J.G.W.) or controlled by one of James's associates in which there was an unusual and suspicious pattern of money moving between and among the accounts inconsistent with normal business practices.

[8] In addition to the pandemic-related funds, deposits into James' shell company bank accounts also included approximately $381,000 in cash and money orders, none of which appeared to be for legitimate business purposes.  Similarly, more than $6 million of the $7.8 million (as described below) in funds that were disbursed from the defendant's shell company bank accounts were cycled to other shell companies in the network.  Additionally, approximately $768,000 was disbursed from these accounts via cash withdrawals and another approximately $218,250 was paid directly to James, his wife, or one of his Imposter Identities.  There was also one payment in October 2023 from one of these shell company accounts for $4,350 paid to an account controlled by co-conspirator, Han Lee.

If anything, the loss amount attributable to the defendant and his network likely exceeds the $550,000 – $1,500,00 that the parties agreed upon the Plea Agreement. The government believes the loss amount set forth in its Plea Agreement is a fair one given the defendant's willingness to admit guilt to the $580,000 in loans which he (personally) fraudulently sought and obtained. However, the network of individuals and shell companies involved in a scheme to defraud and fraudulently obtain pandemic-related relief funds was extensive. To give the Court an idea of the volume, the defendant – using his name or one of his Imposter Identities – controlled at least seventeen known shell company bank accounts through which approximately $7.8 million in funds passed via more than 1,700 structured individual banking transactions.[9] Of these funds, pandemic relief funds obtained by others in James' network were cycled through James' various shell company bank accounts, including at least an additional $760,000 of readily identifiable pandemic related funds fraudulently obtained by others in James' network using *their* respective eleven shell businesses. The bank accounts for these shell businesses had financial transactions with bank accounts controlled by James. In total, at least approximately $6.3 million of the total funds deposited into James' shell company bank accounts was cycled money from one of the many other shell companies involved in the scheme.

Against this backdrop, indeed the defendant's entire network was responsible for far more than the total loss amount of $550,000 – $1,500,000 agreed upon by the parties in the Plea Agreement. Given the rapid movement of funds by the defendant and others in his COVID fraud

---

[9] In addition to the seventeen shell company bank accounts controlled by James, investigators identified at least thirty additional shell company bank accounts controlled by others in James's COVID-fraud network. All but one of these thirty accounts had financial transactions with one or more of James' shell company accounts. These additional accounts had more than $18.4 million in funds pass through the accounts, which similarly consisted of COVID-related funds, cash, and cycled funds from the network of shell companies involved in the scheme. More than $1.2 million was disbursed from these shell company accounts in the form of cash withdrawals.

network and between and among him, his wife and the co-conspirators in the prostitution and money laundering conspiracies, the government cannot fully quantify how much the defendant personally profited off of the government loans he fraudulently obtained. But, to be sure, he certainly did profit off of the fraudulently obtained government funds.

Like he did in the prostitution and money laundering conspiracies, the defendant found an opportunity to financially benefit from criminal activity and chose to exploit it. Given the defendant's role in signing and fraudulently submitted applications for over $580,000 in COVID related relief loans, the agreed-upon loss amount is appropriate for him and this Court should place minimal weight, if any, on his self-serving statements about the disbursements of the COVID relief funds after that money – that he fraudulently obtained – hit his bank accounts.

### B. The History and Characteristics of the Defendant

James clearly had the skills and ability to maintain gainful employment, but he chose instead to play a role in the prostitution and money laundering organization, a role that was critical to its success, and a role for which he was financially rewarded. He began working for Han at least in 2021 and the government is not aware of attempts by James to withdraw from the organization or seek legitimate employment during his multi-year participation in this organization. James was compensated by Han $1,000 per month per lease that he held in his name or his fraudulent identities. He did not have to run the business, vet the sex buyers, book the commercial sex dates or collect the money. He solely had to keep his (or his fraudulent) name on a brothel lease and field calls on occasion to protect the business. This was quick and easy money for him, but make no mistake, he knew what was happening behind the doors of the apartments that he rented.

While involved in the instant prostitution and money laundering conspiracy, he saw an opportunity to make more money, more quickly, by opening bank accounts for shell companies and applying for COVID relief funds in the names of sham businesses. He utilized his two decades

of experience as a businessman and importer and exporter of garment material (a business which he admittedly closed in 2010 when he filed for bankruptcy) to create shell businesses purportedly engaged in importing and exporting garments to conceal COVID relief funds and the profits of the underlying prostitution and money laundering enterprise.

James' background provides little explanation as to why he chose to engage in criminal activity. He grew up in a household with financially and emotionally supportive and hard-working parents who immigrated with the defendant to the United States in the hopes of pursuing a better education and more stable economy. His criminal history did not begin until he was in his 40s, when he was accused of (a later dismissed charge of) forgery in Las Vegas, Nevada. He is married, with children and grandchildren. All this is to say, he was presented with substantial opportunities in life to engage in lawful employment but chose to work for Han's illicit business – and defraud the government of COVID funds – instead. His involvement in various types of criminal activity later in his life was based off of his own financial greed. As with anyone that logically chooses to engage in criminal activity, deeming it more lucrative than other available legitimate work, when their illegal activity is detected, it is critical as a matter of specific deterrence that James face significant consequences for his actions.

C. **The Need for the Sentence Imposed – Deterrence and Protection of the Public**

James' involvement in the prostitution and money laundering scheme ended not because he confronted a crisis of conscience; it ended because agents arrested him and each of the principal participants. Just one month prior to his arrest, he had opened yet another brothel lease for Han's organization. The government believes that a meaningful period of incarceration is needed both to deter future criminal conduct from James and more broadly to deter others from engaging in illegal prostitution and money laundering schemes. This is especially important for a crime of this nature, which is frequently viewed by the public as not serious, and not likely to attract the attention of

federal law enforcement. The organization was active; it was widespread; and although there were attempts to evade detection, it was relatively overt. The websites advertising the services were not hidden on the dark web, but were rather on the open internet, with website names that made them relatively easy to find. While high-end prostitution networks of this nature are relatively common and are sometimes easy for local law enforcement to spot, there are significant challenges to investigating and prosecuting these types of prostitution and money-laundering networks, including language barriers, the inherently private nature of the prostitution activity, the desire for the patrons to remain anonymous (and their resulting covert behavior), and the frequent cash transactions in small dollar amounts (which become significant due to their volume, but which generally do not trigger reporting requirements or attract bank suspicion if artfully deposited). It is important as a matter of general deterrence that when law enforcement invests the resources in thoroughly investigating and uncovering such networks, as they did here with the participation of both federal and local law enforcement, there are significant consequences for the participants.

Additionally, as to the wire fraud charge, the taxpayers who funded relief programs, like the pandemic relief programs, deserve to know that individuals who defrauded the system are being held accountable and required to repay the money that they fraudulently obtained. These sorts of financial crimes are "prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'") (quoting Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After Booker,* 47 Wm. & Mary L.Rev. 721, 724 (2005)); *see also United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("We have previously emphasized the importance of general deterrence in white-collar crime."). The Court's sentence should therefore provide some deterrent to others who may consider defrauding government programs.

### III. Conclusion

For all these reasons and those to be argued at sentencing and considering the GSR as calculated in the Plea Agreement, and the factors enumerated in § 3553(a), the government respectfully recommends that the Court a sentence of 33 months and three years of supervised release. Such a sentence will adequately punish the defendant for his crimes, promote respect for the rule of law, provides just punishment, and affords adequate deterrence to the various types of criminal conduct committed by this defendant. In other words, such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing and is proportionate to sentences of similarly situated defendants.

In addition, the government requests this Court to order forfeiture to the extent detailed in the motion for money judgment and preliminary orders of forfeiture.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ *Lindsey E. Weinstein*
LINDSEY WEINSTEIN
Assistant United States Attorney

May 26, 2025

### Certificate of Service

I hereby certify that I submitted this document for electronic filing via the ECF system, which will send an electronic copy to all counsel of record who are identified on the notice of electronic filing.

By: /s/ *Lindsey Weinstein*
LINDSEY WEINSTEIN
Assistant United States Attorney
District of Massachusetts